**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE. NO.: 19-20273-CR-MORENO**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**vs.**

**BILL K. KAPRI a/k/a DIEUSON OCTAVE a/k/a "KODAK BLACK,"**

**Defendant.**
_______________________________________/

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

The defendant, Bill K. Kapri a/k/a Dieuson Octave a/k/a "Kodak Black" (the "Defendant"), will come before this Honorable Court on November 13, 2019, having pled guilty to one count of making a false statement in connection with the acquisition or attempted acquisition of a firearm in violation of Section 922(a)(6) of Chapter 18 of the United States Code. He submits this sentencing memorandum, by and through his undersigned counsel, to aid the Court in determining an appropriate sentence under Section 3553(a) of the same chapter of that Code, and states as follows:

## I. INTRODUCTION.

### A. The Criminal Paperwork and the Guilty Plea.

This case arises from the Defendant's completion of a Form 4473, a form developed for gun sales by the Bureau of Alcohol, Tobacco, Firearms and Explosives to implement the Gun Control Act of 1968's statutory requirements. See Abramski v. United States, 573 U.S. 169, 173

(2014). Form 4473 "lists all the factors disqualifying a person from gun ownership, and asks the would-be buyer whether any of them apply *(e.g., '[h]ave you ever been convicted . . . of a felony?')*." Id. The Defendant provided incorrect answers twice, on January 25 and March 1 of 2019, in completing Form 4473, leading to his entering a plea of guilty on August 22, 2019 "to a two count Indictment charging him with making a false statement in connection with the acquisition or attempted acquisition of a firearm, in violation of 18 U.S.C. § 922(a)(6)." DE 36 at ¶ 1, Presentence Investigation Report [hereinafter the "PSI Report"] (Nov. 7, 2019).

B. The Statutory Maximum, the Guidelines and the Government's Recommendation.

As the United States Probation Office (the "U.S.P.O.") noted, "[a]s to each of Counts One and Two, the maximum term of imprisonment is ten years, 18 U.S.C. § 924(a)(2)." Id. at ¶ 100. It has calculated, pursuant to the United States Sentencing Guidelines (the "Guidelines"), a "guideline imprisonment range [of] 46 months to 57 months." Id. at ¶ 101. The Defendant respectfully submits that **the *advisory* guideline range is 37 to 44 months,[1] and that he is in Zone C of the Sentencing Table. No downward departures under Chapter Five of the Guidelines have been offered. Finally, The Government has agreed to recommend the bottom of the guideline sentence.**

C. The Factors to be Considered.

The Defendant's conduct involves a crime of deception, rather than a crime of possession. The facts in this case are far more nuanced and distinctive than that of a typical "lie and buy" sale. Though the court is well versed in the facts of the case, there are certain facts that the court should also consider prior to the sentencing date.

[1] The disparity in calculations has been briefed extensively in other filings.

Before this incident, not only did the Defendant consult with a former Broward Sheriff employee to see if he was eligible to purchase a firearm ,[2] but he also enrolled in a firearms training course and obtained a certificate of completion. As to the instant offense, the Defendant advised the undersigned that he immediately wanted to accept responsibility. As counsel, the undersigned advised the Defendant to wait to change his plea until a thorough investigation of the allegations and the surrounding facts was completed and all potential defenses were thoroughly discussed. In spite of what the undersigned counsel considers a very strong defense to the crime charged, the Defendant instructed that he wanted to change his plea to guilty and take responsibility for the all of the charges he was indicted on.

Finally, in anticipation of the Court inquiring as to the Defendant's need for three (3) firearms, undersigned counsel required the Defendant to undergo a lie detector test administered by a well-recognized lie detector examiner. See Exhibit "A" (attaching the examiner's *curriculum vitae*). When asked the question "if he purchased these weapons for self-defense," the Defendant answered "yes" and the results were marked as 99.9% truthful. Although not admissible for purposes of trial, this report is certainly something the Court can consider in regards to sentencing. Coincidentally, the timing of this purchase was very close in time to the Defendant receiving legitimate and very public death threats by known gangs and gang members. His team was so concerned that they also purchased an armored Cadillac Escalade to transport him. These are just some of the sentencing factors under 18 USC § 3553 detailed *infra* which undersigned counsel believes points to a below-guideline sentence.

[2] Although this memorandum discusses the background of the charges and what led the Defendant to purchase the firearms in question, its content in no way should negate his plea of guilty before the Court.

## II. SENTENCING SUBMISSION AND REQUEST FOR ALTERNATIVE SENTENCE.

**We believe the *advisory* guideline range is 37 to 44 months and Bill K Kapri is in Zone C of the Sentencing Table. No downward departures under Chapter Five of the Guidelines have been offered. We belive one is warranted. The Government has agreed to recommend the bottom of the guideline sentence.**

The seminal case of United States v. Booker, 543 U.S. 220 (2205), "invalidated [] the statutory provision, 18 U.S.C. § 3553(b)(1) (2000 ed., Supp. IV), which made the Sentencing Guidelines mandatory[] . . . ." Gall v. United States, 552 U.S. 38, 46 (2007). The Court went on to explain that "***[a]s a result, the Guidelines are now advisory***[] . . . ." Id. (emphasis added). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." Id. at 49; see also id. ("[T]he Guidelines should be the starting point and the initial benchmark.").

As the United States District Court of Appeals for the Eleventh Circuit explained,

> [t]he district court's task is to impose a sentence that will adequately (1) "reflect the seriousness of the offense," (2) "promote respect for the law," (3) "provide just punishment," (4) "afford adequate deterrence," (5) "protect the public from further crimes of the defendant," and (6) provide the defendant with any needed training and treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). The task is a holistic endeavor that requires the district court to consider a variety of factors: (1) the nature and circumstances of the offense, (2) the defendants history and characteristics, (3) the kinds of sentences available, (4) the applicable sentencing guidelines range, (5) pertinent policy statements of the Sentencing Commission, (5) (sic) the need to provide restitution to any victims, and (6) the need to avoid unwarranted sentencing disparities. Id. at § 3553(a).

United States v. Rosales-Bruno, 789 F.3d 1249, 1253-54 (11th Cir. 2015). While "[t]o arrive at an appropriate sentence, the district court must consider all of the applicable § 3553(a) factors[,]

[citation omitted,] [t]hat does not mean, however, that it must give all of the § 3553(a) factors equal weight. Instead, the sentencing court '***is permitted to attach great weight to one factor over others***.'" Id. at 1254 (emphasis added) (citing United States v. Shaw, 560 F.3d 1230, 1237 (11th Cir. 2009)).

"The application of the guidelines is not complete until the departures, if any, that are warranted are appropriately considered." U.S. v. Jordi, 418 F. 3d 1212, 1215 (11th Cir. 2005). In exercising its discretion to fashion an appropriate sentence, "the sentencing judge [must] consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue". Koon v. United States, 518 U.S. 81, 113 (1996). This is particularly applicable to the Defendant, considering the "human failings" of this highly impressionable and heavily troubled young man being led astray by environmental pressures and influences. Although the PSI Report does not identify any factors that may warrant a downward departure, the Defendant believes such factors do exist and asks this Court to consider such factors under 18 USC § 3553 in fashioning a reasonable sentence below the advisory guideline range.

A. Nature and Circumstances of the Offense.

i. *The Factual Proffer.*

The Defendant executed a factual proffer, and in addition admitted to the offenses he was charged with - knowingly make a false and fictitious written statement to the dealer, which statement was intended to deceive the dealer with respect to any fact material to the lawfulness of the sale and other disposition of such firearms, in that the defendant stated in Bureau of Alcohol, Tobacco, Firearms, and Explosives Form 4473 that he was not under indictment or information in

any court for a felony, or any other crime for which the judge could imprison him for more than one year, when in truth and in fact, and as the defendant then and there well knew, he was under indictment or information for a felony or any other crime for which the judge could imprison him for more than one year. Although, the Defendant as stated previously had some viable defenses to the charges, he accepted responsibility and is prepared to be sentenced accordingly.

i. *The Speedy Resolution of Criminal Liability.*

As eluded to *supra*, and to elaborate, despite the insistence of counsel to investigate the allegations, take interviews of witnesses and examine the evidence posed against the Defendant, ***the resolution to the criminal matter was rather quick due in large part to the Defendant's entirely independent wishes***. The Defendant informed the undersigned counsel that he wanted to immediately take a plea in the case and proceed to sentencing. But for the undersigned's insistence to allow for an examination of evidence, the Defendant would have taken a plea the day after arraignment.

ii. *The Relative Rarity of the Charges.*

Normally, this crime is one that is rarely charged. A study conducted in regards to false purchases demonstrated that of the 12,710 National Instant Criminal Background Check System ("NICS") denials that the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") referred to its field divisions for investigation in the fiscal year of 2017, 12 were prosecuted. See Report to the Ranking Member, Subcommittee on Commerce, Justice, Science, and Related Agencies, Committee on Appropriations, House of Representatives: Few Individuals Denied Firearms Purchases are Prosecuted and ATF Should Assess Use of Warning Notice in Lieu of Prosecutions, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, 14 (Sep. 2018). For the

fiscal year of 2016, 11,067 NICS denials were referred for investigation and only 13 were prosecuted. See id.

iii. *The Aggravation of the Potential Sentence Based on the Defendant's Bond.*

The sentence the Defendant is facing is a product of him being on bond, and as such being labeled a prohibited person. In reality, ***the Defendant, but for being on bond, would have been able to legally purchase and have a firearm***. Due to him being on bond, the applicable guidelines are pushed to a base of 20. He is essentially treated the same as if he was a felon in possession of a firearm. He would have been facing half of the low end of the current guidelines, but for him being on bond on a three (3) year old case, that by all accounts will resolve with a change of charge to a significantly lower crime category.

In other words, this fact that he was out on bond, increases the bottom of the *advisory* guideline range almost three-fold. Although § 5K2.0 addresses circumstances not taken into consideration by the Sentencing Commission in determining the applicable guideline range, we believe this Court may consider this under 18 USC § 3553 and fashion a below-guideline sentence in this case.

B. History and Characteristics of Defendant: 18 USC § 3553(a)(1).

i. *Personal and Family History.*

The Defendant grew up in one of the poorest and most disenfranchised neighborhoods within the Southern District of Florida without a father and with a mother who worked multiple jobs to feed and shelter her family, making him a "latch key kid." As the United States Supreme Court has noted, "children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment'

and lack the ability to extricate themselves from horrific, crime-producing settings." Miller v. Alabama, 567 U.S. 460, 471 (2012) (quoting Roper v. Simmons, 543 U.S. 551, 569 (2005)) (emphasis added). The Defendant became of a victim and product of his environment, and at age 15 had his first brush with the criminal justice system. The Defendant pled guilty in that case, and since that time has been charged in various criminal cases. The most serious cases are the ones he plead to when he was 18 years old, and the robbery and kidnapping case he was charged with on paper looks to be the most serious of the offenses.

The facts of the case are distinctively different than the charges that he plead to on the matter. The case revolved around five (5) individuals committing home invasion robberies. The victim of one of these home invasion robberies was the Defendant's mother. Instead of calling the police, which certainly would have been the more prudent course of action, the Defendant found out who the individuals were, drove around the neighborhood and picked them all up, take away their cell phones, and took them to his mother's home and make them apologize for the robbery. The police felt that it was of more importance to charge the Defendant than to charge the other five (5) people with the home invasion and labeled them as victims. They were never charged with the crime they committed. The most interesting part of the story is that of the five (5) individuals, three (3) are currently incarcerated on home invasion charges. One of the three has recently been charged with two (2) first degree murders, committed during a home invasion and is awaiting trial in Broward County Florida.

Although the Defendant has been charged many times in the past most have been dismissed, dropped or abandoned. In fact, his criminal history would have been a category two (2), but for a misdemeanor possession of marijuana charge that he received a jail sentence on in

St. Lucie County.  One other matter that was discussed in the PSI Report was a charge of child endangerment, where there is a discussion of a case that was summarily and quite quickly "no info'd"  The PSI Report describes a scene that quite frankly did not happen, and that is why it was never filed by the State of Florida.  There was actual video evidence that came to light that was in direct contradiction to the police report, that formed the basis to search the Defendant's house (all charges were eventually dismissed in that case). The unusual part of that case that was dismissed, over a year prior to this matter, is that it involved the same ATF agents that investigated and charged the Defendant in the case before the court.

Despite growing up in a neighborhood that sees deaths and robberies on a daily basis, the Defendant, under the name "Kodak Black," was able to become a Grammy-nominated hip-hop artist signed to Atlantic Records, and "[i]n the world outside the jails and courtrooms, Kodak Black is seen as one of the most prodigious rappers of his generation." Brett Clarkson, How Kodak Black made it big – and could lose it all, Sun Sentinel, available at https://www.sunsentinel.com/news/florida/fl-reg-kodak-black-profile-20170420-story.html (Apr. 27, 2017). The Sun Sentinel went on to explain that "The Fader, a music publication, called him 'America's most prolific rapper. "Born on June 11, 1997, the boy who would become Kodak grew up in Golden Acres, a small, barracks-like cluster of public housing originally built in the late 1940s to house farm workers. Situated off Martin Luther King Jr. Boulevard west of Andrews Avenue, the community spans just over 80 acres and over 170 units. Like other low income housing tracts, it's had its problems over the years with crime, drugs and the like[] . . . ." Brett Clarkson, How Kodak Black made it big – and could lose it all, Sun Sentinel, available at https://www.sunsentinel.com/news/florida/fl-reg-kodak-black-profile-20170420-story.html (Apr.

27, 2017). hardest working teenage rapper.' People in his old neighborhood talk about a quiet little boy walking around with a notepad, constantly writing rhymes." Id.

The Defendant has resided in Broward County almost all of his life, and that is where all of his family lives. He has one son, King Octave, that he supports and has 50/50 custody split. He is often with his son and the impact of this arrest has affected him as well. The only time Mr. Kapri he ever left Broward County for a long term period was to live in Los Angeles for about half a year to record an album and for other work purposes.

Effective October 27, 2003, the Sentencing Commission amended § 5H1.6 to limit the availability of departures for family ties and responsibilities. The new application note, § 5H1.6, comment (n.1(A)(i)-(iii), instructs the court to consider the seriousness of the offense, the defendant's involvement in that offense, and the members of the defendant's family. Further, comment. (n.1(B)(i)-(iv) requires the court to consider if "the defendant's service of a sentence within the guideline range will cause a substantial loss of essential care-taking or essential financial support to his family," that "the loss of care-taking or financial support exceeds the harm ordinarily incident to incarceration for a similarly situated defendant," that "the loss of care-taking or financial support is one in which no effective remedial or ameliorative programs reasonably are available," and that "the departure will effectively address the loss of care-taking or financial support." Notwithstanding this pre-Booker amendment, the Defendant respectfully asks this Court to consider his family ties and responsibilities as a § 3553 sentencing factor in fashioning a below-guideline sentence in his case.

*ii. Charitable Works.*

The Defendant has also participated in extensive philanthropy, both within the Southern

District of Florida and outside of it. For example, he delivered toys to 150 children at Paradise Childcare in Broward County, Florida this past holiday season, and also spent around $5,000.00 for that organization's Christmas party. See Kodak Black Getting His Santa On . . . DONATES TOYS TO 150 KIDS IN FLORIDA!!!, TMZ, available at https://www.tmz.com/2018/12/20/kodakblack-donate-toys-florida-charity-holidays/ (Dec. 20, 2018). This past holiday season, the Defendant also "took part in something called the 'Gifts of Chai' with Rabbi Scheur Kaplan[,]" id., of the Chabad on Las Olas in Fort Lauderdale. Rabbi Kaplan remarked that "Kodak sent the gifts of Chai 10x, which is amazing. This is very special and we are thankful." Id. Two months prior to that, the Defendant donated over $10,000.00, as well as a year's supply of underwear and socks upon learning there was a shortage, to the Jack & Jill Children's Center in Broward County, Florida, which is a non-profit provider of early childhood education. See Kodak Black[:] I LOVE THE KIDS!!! . . . HERE'S $10K, TMZ, available at https://www.tmz.com/2018/10/01/kodakblack-donation-ten-thousand-dollars-children-charity-education/ (Oct. 1, 2018).

Also within the Southern District of Florida, the Defendant planned to use the proceeds from the Rolling Loud Concert performance, the one he was arrested en route to, in order "to start a scholarship fund in honor of Meadow Pollack, who was one of the students shot and killed during the shooting at Marjory Stoneman Douglas High School in parkland, F[lorida] last year." Tony M. Centeno, KODAK BLACK PLANNED TO USE ROLLING LOUD CHECK TO START SCHOLARSHIP FOR PARKLAND SHOOTING VICTIM, LAWYER SAYS, XXL, available at https://www.xxlmag.com/news/2019/05/kodak-black-rolling-loud-parkland-victim/ (May 16, 2019). Meadow Pollack's brother, Hunter Pollack, who has become a political advocate in the

wake of his sister's murder, posted that [g]rowing up in Broward, my sister was a huge Kodak Black fan. Meadow and her boyfriend Brandon shared plenty of memories together listening to his music. Her dream was to always meet him. Since she passed, I promised Brandon I'd arrange for them to meet. Kodak invited us to @rollingloud where he was going to announce a scholarship in honor of Meadow-without knowing he'd be arrested. @hunter_pollack, Instagram, available at https://www.instagram.com/p/Bxi6RvfhJta/ (May 17, 2019) (emphasis added).  Outside of the Southern District of Florida, the Defendant donated $12,500.00 to buy notebooks for every student within "a school district where a majority of its students come from low-income communities." KODAK BLACK PICKS UP TAB ON 7,600 NOTEBOOKS . . . It's for the Kids!!!, TMZ, available at https://www.tmz.com/2019/05/03/kodak-black-donates-notebooks texas-kids-weapons-drugs-arrest/ (May 3, 2019).

The Defendant also donated money to the family of a slain law enforcement officer in South Carolina, as "he was especially upset about [the] man's family now growing up without a father." Mike Walters, Kodak Black Makes Donation to Family of Slain Officer in South Carolina, The Blast, available at https://theblast.com/kodak-blackdonation-slain-officer-south-carolina/ (Oct. 16, 2018).  In fact, although not written about, Mr. Kapri anonymously donates to just many families of officers that have died in the line of duty.  Mr. Kapri has instructed the undersigned to not discuss those matters in detail, as he did those donations anonymously for a reason, namely for the good of those families and not for the press.  That being said I think it is important for the court to know that although the Government paints a picture of a non law abiding citizen, he has a very deep belief in doing the right things for people in need.

B. Rehabilitation, Deterrence and Recidivism.

The sentencing factors of 18 USC § 3553(a)(1) include the nature and circumstances of the offense and the history and characteristics of the defendant. However, the Defendant is aware they also include the sentencing factors of 18 USC § 3553(a)(2), and this Court must also consider rehabilitation, deterrence and recidivism.

The Sentencing Commission's report, "Measuring Recidivism," offers a statistical analysis of the type of person most likely and least likely to re-offend.. The study demonstrated that (1) those who are married are less likely to recidivate than those who were not; (2) those who have not used illicit drugs are less likely to recidivate than those who did; (3) non-violent offenders are less likely to recidivate than violent offenders; (4) first time offenders are less likely to recidivate than repeat offenders; (5) those who are employed are less likely to recidivate than those who are not employed; and (6) those who are sentenced to non-jail sentences are less likely to recidivate than those who receive straight jail.

The Defendant is now 22 years old. By way of his guilty plea in this case, he will remain a convicted felon for the remainder of his life, something he never was prior to this case. He also may not e able to participate in the RDAP program, due to detainers in other states. He has tried to learn from his mistakes of the past, even obtaining his GED. The case before the court involves lying on a governmental form to obtain firearms. Although the Government states that one of the weapons was found at the scene of a shooting, the weapon was never fired and was found with another individual's fingerprints and DNA on it. We also believe that just the threat of incarceration is a deterrent itself. However, admittedly, the Defendant also knows this Court must fashion a sentence that serves as a deterrent to others who might be considering engaging in

criminal conduct similar to what he admittedly involved himself. To that end, due to the high-profile nature of this case, the undersigned believes it will be used as a focus point in regards to filling out governmental forms wrongfully. The lengthy sentence alone should serve as an adequate warning to others who might involve themselves in similar conduct.

i. *Latest Sentencing Statistics.*

The United States Sentencing Commission's "Sourcebook" of Federal Sentencing Statistics for fiscal year 2017 provides statistics for 66,873 cases sentenced that year. Specifically, as to 2,282 cases sentenced in the Southern District of Florida last year, 42.9 % received sentences below the *advisory* guideline range; 8.7 % because of substantial assistance motions, and 29.7 %, almost four times the number of Government sponsored motions, because of the sentencing factors of 18 USC § 3553. Nationally, the nature and circumstances of the offense and/or history and characteristics of the defendant were cited as reasons for a downward variance in 6,930 cases. Indeed, district courts continue to exercise discretion, post-Booker, and impose sentences below the *advisory* guideline range.

## III. CONCLUSION.

Based upon the facts and factors set forth above, the Defendant respectfully requests that this Court impose a sentence below the *advisory* guideline range after considering all the 18 USC § 3553 factors identified in this filing.

The Defendant and undersigned counsel thank this Court for considering our Response to the PSR and this Memorandum in Aid of Sentencing. Undersigned counsel will have further remarks at the time of sentencing.

[CERTIFICATE OF SERVICE ON THE NEXT PAGE]

**CERTIFICATE OF SERVICE**

THE UNDERSIGNED HEREBY CERTIFIES that the foregoing document was electronically filed with the Clerk of the Court using CM/ECF and that a true and correct copy of this document has been served on all persons on the following Service List on November 8, 2019, either electronically in compliance with the Notice of Electronic Filing generated by CM/ECF or in some alternative manner for those parties who may not be permitted to receive to receive electronic filings via CM/ECF.

**BRADFORD COHEN LAW**
Counsel for Defendant
1132 SE 3rd Avenue
Fort Lauderdale, Florida 33316
Telephone: (954) 523-7774
Facsimile: (954) 523-2656
Email: service@floridajusticefirm.com
Secondary Email: michael@floridajusticefirm.com

By: /S/ Bradford M. Cohen, Esq.
BRADFORD M. COHEN, ESQ.
Florida Bar Number: 118176
MICHAEL J. MCMULLEN, ESQ.
Florida Bar Number: 106109

**SERVICE LIST**

**United States of America V. Kapri**
**Case No.: 19-20273-cr-MORENO/LOUIS**

---

Bruce Brown
Assistant United States Attorney
500 E. Broward Blvd, 7th Floor
Fort Lauderdale, FL 33301
bruce.brown2@usdoj.gov
Phone: (954) 356-7255 ex. 3514
Fax: (954) 356-7336